[No. D043829. Fourth Dist., Div. One. Jan. 26, 2005.]

THE H.N. & FRANCES C. BERGER FOUNDATION, Plaintiff and
Appellant, v.
CITY OF ESCONDIDO et al., Defendants and Respondents.

**COUNSEL**

Barton, Klugman & Oetting, Ronald R. St. John and Tod V. Beebe for Plaintiff and Appellant.

Endeman, Lincoln, Turek & Heater, Donald R. Lincoln, Linda B. Reich; Jeffrey Epp, City Attorney, and Steven J. Nelson, Deputy City Attorney, for Defendants and Respondents.

## OPINION

**McCONNELL, P. J.**—The H.N. & Frances C. Berger Foundation (Berger), the owner of a mobilehome park in the City of Escondido (the City), appeals a judgment denying its petition for writ of mandate (Code Civ. Proc., § 1094.5) challenging the adequacy of a $31 rent increase[1] authorized by the City of Escondido Mobilehome Rent Review Board (the Board), and dismissing on summary judgment an accompanying complaint for damages on theories of inverse condemnation and violation of a right to constitutional due process under title 42 United States Code section 1983. Berger contends the Board's decision is not supported by substantial evidence, and, specifically, the Board failed to adequately account for inflation as a factor affecting the fair return analysis. We agree the Board's decision lacks evidentiary support. We reverse the judgment insofar as it concerns the court's denial of the petition for writ of mandate, and affirm it in all other respects.

### FACTUAL AND PROCEDURAL BACKGROUND

In June 1988 the City's voters approved a mobilehome rent control ordinance (Ordinance; Escondido Mun. Code, § 29-101 et seq.) designating the Escondido City Council as the Board, establishing base rent ceilings at January 1, 1986 levels, and requiring owners to obtain the Board's approval for any rent increase. The Ordinance, which has been the subject of extensive litigation, provides that on application by the owner the Board "shall approve such rent increase as it determines to be just, fair and reasonable." The Ordinance specifies no method or formula for determining rents, but it enumerates nonexclusive factors the Board shall consider, including changes in the Consumer Price Index (CPI),[2] comparable rents and capital improvements.[3] The Ordinance provides no guidance on how the Board should weigh the factors.

---

[1] All rent figures discussed are per month per space.

[2] The CPI "is a statistical measure of fluctuations in urban consumers' costs of living widely used to measure the dollar's purchasing power. The United States Bureau of Labor Statistics computes the index by calculating percentage price changes of a sample 'market basket' of goods and services in major expenditure groups, then weighs the percentage price changes in accordance with the relative importance of each item. The index is the average of these weighted percentage price changes." (*Oceanside Mobilehome Park Owners' Assn. v. City of Oceanside* (1984) 157 Cal.App.3d 887, 902, fn. 5 [204 Cal.Rptr. 239].)

[3] The enumerated factors are:

"(1) Changes in the [CPI] for All Urban Consumers in San Diego Metropolitan Area published by the Bureau of Labor Statistics.

"(2) The rent lawfully charged for comparable mobilehome spaces in the City of Escondido.

"(3) The length of time since either the last hearing and final determination by the Board on a rent increase application or the last rent increase if no previous rent increase application has been made.

"(4) The completion of any capital improvements or rehabilitation work related to the mobilehome space or spaces specified in the rent increase application, and the cost thereof,

Berger, a charitable foundation, acquired the Town & Country Club Park (the Park) in 1988 by donation. The Park is a "senior park," in which at least one resident in 80 percent of the spaces must be a minimum of 55 years old.

In February 2002 Berger applied for a rent increase. At the time, the average rent was $360.[4] Berger claimed various valuation approaches justify a rent increase of between $65.26 and $140; it sought an increase of $90, or 25 percent.

At the September 2002 administrative hearing the parties presented reports and testimony, which will be discussed more fully in part II, *post*. The City's principal expert recommended a rent increase of between $38.44 and $56.36. The Board adopted a resolution authorizing a $31 increase.

Berger then filed a petition in the superior court for administrative mandamus, along with a complaint for damages under theories of inverse condemnation and violation of title 42 United States Code section 1983, alleging the rent increase is inadequate and does not properly account for inflation. After reviewing the administrative record, the court denied the petition, concluding substantial evidence supports the Board's decision. The City then successfully moved for summary judgment on the complaint.[5]

---

including such items of cost, including materials, labor, construction interest, permit fees, and other items as the Board deems appropriate.

"(5) Changes in property taxes or other taxes related to the subject mobilehome park.

"(6) Changes in rent paid by the applicant for the lease of the land on which the subject mobilehome park is located.

"(7) Changes in the utility charges for the subject mobilehome park paid by the applicant and the extent, if any, of reimbursement from the tenants.

"(8) Changes in reasonable operating and maintenance expenses.

"(9) The need for repairs caused by circumstances other than ordinary wear and tear.

"(10) The amount and quality of services provided by the applicant to the affected tenant.

"(11) Any existing written lease lawfully entered into between the applicant and the affected tenant." (Ordinance; Escondido Mun. Code, § 29-104(g).)

[4] This action is the most recent of several actions Berger has brought challenging the Board's rulings on its applications for rent increases. In 1999 this court issued an opinion reversing the denial of Berger's petition for writ of mandate challenging the Board's decision to grant it two particular increases, part of a cumulative $41.39 increase granted over a period of nearly six years. We concluded the Board placed undue emphasis on Berger's acquisition of the Park as a gift and failed to adequately account for inflation as a factor affecting the fair return analysis. (*H. N. and Frances C. Berger Foundation v. City of Escondido* (Feb. 26, 1999, D029003) [nonpub. opn.].) After remand, the parties reached an agreement raising average rents from $285 to $360.

[5] The record includes a minute order granting the summary judgment motion, but it does not include an appealable judgment. "[A]n order granting summary judgment is not an appealable order. [Citations.] The appeal must be taken, instead, from a judgment entered on the basis of the summary judgment order." (*Levy v. Skywalker Sound* (2003) 108 Cal.App.4th 753, 761, fn.

## DISCUSSION

### I

*Petition for Writ of Mandate*

#### A

*Standard of Review*

At both the superior court and appellate court levels, a rent control board's ruling on an application for a rent increase is subject to review under the substantial evidence test. (*Yee v. Mobilehome Park Rental Review Bd.* (1993) 17 Cal.App.4th 1097, 1106 [23 Cal.Rptr.2d 1].) The reviewing court must consider all relevant evidence in the administrative record, but it begins with the presumption the record contains evidence to sustain the board's findings of fact. (*Carson Harbor Village, Ltd. v. City of Carson Mobilehome Park Rental Review Bd.* (1999) 70 Cal.App.4th 281, 287 [82 Cal.Rptr.2d 569]; *County of San Diego v. Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 554 [195 Cal.Rptr. 895].) "In general, substantial evidence has been defined . . . as evidence of ' " 'ponderable legal significance . . . reasonable in nature, credible, and of solid value' " ' [citation]; and . . . as ' "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." ' " (*County of San Diego v. Assessment Appeals Bd. No. 2*, at p. 555.)

#### B

*General Principles Governing Rent Control*

The City's "ability to control rents is principally circumscribed by substantive due process, which requires that all legislation have ' "a reasonable relation to a proper legislative purpose." ' " (*Morgan v. City of Chino* (2004) 115 Cal.App.4th 1192, 1198 [9 Cal.Rptr.3d 784].) "Constitutionally valid rent control schemes must allow park owners to earn a 'just and reasonable' or 'fair' return on their investment. [Citations.] The term 'fair return' is incapable of precise definition [citation], but is generally considered to include returns that are 'commensurate with returns on investments in other enterprises having comparable risks' [citation], or 'high enough to encourage good management, reward efficiency, discourage the flight of

---

7 [134 Cal.Rptr.2d 138].) The defendants, however, have not moved to dismiss the appeal, and in the interests of justice and to avoid delay, we construe the order granting summary judgment as incorporating an appealable judgment. (*Id.* at pp. 761–762.)

capital, and enable operators to maintain their credit.' " (*Donohue v. Santa Paula West Mobile Home Park* (1996) 47 Cal.App.4th 1168, 1177 [55 Cal.Rptr.2d 282]; see *Birkenfeld v. City of Berkeley* (1976) 17 Cal.3d 129, 165 [130 Cal.Rptr. 465, 550 P.2d 1001].)

■ The term "fair rate of return" refers "to a constitutional *minimum* within a broad zone of reasonableness. . . . [W]ithin this broad zone, the rate regulator is balancing the interests of investors, i.e., landlords, with the interests of consumers, i.e., mobilehome owners." (*Galland v. City of Clovis* (2001) 24 Cal.4th 1003, 1026 [103 Cal.Rptr.2d 711, 16 P.3d 130].) "[A] rent control provision [that] does not permit a just and reasonable return on a landlord's investment is confiscatory." (*City of Berkeley v. City of Berkeley Rent Stabilization Bd.* (1994) 27 Cal.App.4th 951, 962 [33 Cal.Rptr.2d 317] (*City of Berkeley*).)

■ In California, a rent control system "must generally permit profits to be adjusted over time for inflation so that the real value of that profit does not shrink toward the vanishing point." (*Galland v. City of Clovis, supra,* 24 Cal.4th at p. 1026.) "[I]f the fixed amount of a landlord's profit remains the same year after year his [or her] return will in time diminish in real value[.] . . . Furthermore, although a fixed profit amount may produce a reasonable or fair return on investment for low-risk investments such as bonds, . . . investment in rental units contemplates a higher risk and hence, in times of high inflation and when viewed in the long term, demands more than mere maintenance of an existing profit amount. [Citations.] Therefore, although [an] ordinance may properly *restrict* landlords' profits on their rental investments, it may not indefinitely *freeze* the dollar amount of those profits without eventually causing confiscatory results." (*Fisher v. City of Berkeley* (1984) 37 Cal.3d 644, 683 [209 Cal.Rptr. 682, 693 P.2d 261].)

■ The California Supreme Court has "expressly reject[ed] the notion that any particular formula must be used in determining a just and reasonable return." (*Carson Mobilehome Park Owners' Assn. v. City of Carson* (1983) 35 Cal.3d 184, 191 [197 Cal.Rptr. 284, 672 P.2d 1297], citing *Power Comm'n v. Pipeline Co.* (1942) 315 U.S. 575, 586 [86 L.Ed. 1037, 62 S.Ct. 736] ["Constitution does not bind rate-making bodies to the service of any single formula or combination of formulas"]; accord, *Power Comm'n v. Hope Gas Co.* (1944) 320 U.S. 591, 601–602 [88 L.Ed. 333, 64 S.Ct. 281]; see also *Birkenfeld v. City of Berkeley, supra,* 17 Cal.3d at p. 165; *Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 680; *San Marcos Mobilehome Park Owners'*

*Assn. v. City of San Marcos* (1987) 192 Cal.App.3d 1492, 1498 [238 Cal.Rptr. 290].) Rather, the "selection of an administrative standard by which to set rent ceilings is a task for local governments . . . and not the courts." (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 681.)

C

*Lack of Substantial Evidence*

1

The City's expert on the fair return issue, Kenneth Baar, Ph.D., advocated a maintenance of net operating income (MNOI) standard. In his report, Dr. Baar explained that while the Ordinance does not set forth a specific fair return standard, "it mandates consideration of the types of factors that are considered in an MNOI formula."

The MNOI standard, which Dr. Baar also refers to as the cost pass-through approach, is intended to ensure that an owner's net operating income (NOI) will not be reduced by rent control: the rent increase consists of the base period rent plus the increase in operating expenses since the base year. (Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L.Rev. 723, 809–810 (hereafter *Guidelines for Rent Control Laws*).) The MNOI standard "recognizes that in the rental housing market, ratios of rental income to value, equity, and gross income vary substantially among buildings. Therefore, rather than designating a particular rate of return as fair, [MNOI] standards pursue the best available option, which is to preserve prior [NOI] levels." (*Id.* at p. 810.)

According to Dr. Baar, the thorny issue associated with the use of an MNOI standard is what type of adjustment, if any, should be made to the base year NOI to account for inflation and allow for growth in income (referred to as "indexing"). (*Guidelines for Rent Control Laws, supra,* 35 Rutgers L.Rev. at p. 811.) Some rent control agencies allow no adjustment for inflation, some allow full inflation adjustments and others allow adjustments of various fractions of the inflation rate. (*Id.* at pp. 811–813.) A full inflation adjustment, which Berger sought here, would increase NOI at the inflation rate. (*Id.* at p. 811.) According to Dr. Baar's report, various California municipalities use from 40 percent to 100 percent CPI indexing ratios in their MNOI standards to account for the effect of inflation. (See also *City of Berkeley, supra,* 27 Cal.App.4th at pp. 968–978.)

Dr. Baar calculated that under an MNOI standard, Berger's rent should be increased by $13.87 to cover the $25,464 increase in operating costs between 1998 and 2001. He recommended additional increases of $10.56 for two capital improvements[6] and $2.07 to cover the $3,800 long-form application fee.

Dr. Baar's report includes alternate MNOI standards that adjust 1998 NOI of $373,993 by various percentages of the inflation rate, or increase of 14.66 percent in the CPI between the end of 1998 (the date of Berger's last application for a rent increase) and the end of 2001. Dr. Baar calculated that indexing of 40 percent, 70 percent and 100 percent would require additional rent increases of $11.94, $20.90 and $29.86, respectively.[7] Adding those amounts to increases for higher operating expenses, capital improvements and the application fee, total rent increases using 40 percent, 70 percent and 100 percent indexing would be $38.44, $47.40 and $56.36, respectively. Dr. Baar recommended 40 percent indexing, and advised that "a $38.44 rent increase . . . is required to provide a fair return under [an MNOI] standard." At the hearing, Dr. Baar explained: "No court has said that 100% indexing is required. I don't know of any ordinance or situation where [MNOI] indexing is used where lower than 40% [indexing] is used. A number of ordinances use 40%."

Additionally, Dr. Baar's report addresses rent increases based solely on the 14.66 percent increase in the CPI during the relevant time. He calculated that using 60 percent, 75 percent or 100 percent of the CPI increase, new rents would be $31.67, $38.59[8] and $52.78, respectively. This calculation does not concern NOI. Rather, the inflation rate of 14.66 percent, or fraction thereof, is multiplied by the base rent of $360. Dr. Baar noted that under the Board's written guidelines it shall take into account no more than 60 percent of increases in the CPI.[9] He also noted, however, that the Board had an

---

[6] The $10.56 consists of $9.37 for street paving and $1.19 for a backflow system. These increases would terminate after 15- and 20-year amortization periods, respectively. The $2.07 increase would terminate after one year. The Ordinance provides: "The Board may provide that an increase in rent or a portion of an increase in rent granted by the Board be limited to the length of time necessary to allow the park owner to reasonably amortize the cost of a capital improvement, including interest. Such increase granted as a result of the capital improvement shall not continue beyond the time necessary for reasonable amortization of the cost of such improvement."

[7] The Board's ruling applies to 142 of the Park's 155 spaces. Dr. Baar used 153 spaces in his calculations, presumably because the "rents of eleven spaces have already been raised to the level requested by [Berger] pursuant to vacancies (changes in mobilehome ownership)."

[8] It appears that the $38.59 figure should actually be $39.58.

[9] The guidelines explain that "many components of CPI (such as food, entertainment, medical care, shelter, and apparel [and] upkeep) do not pertain to the cost of owning and operating a mobilehome park," and a rent increase based on an increase in the CPI "shall

"approach of granting 75 [percent] CPI increases pursuant to short form petitions."

The City also retained an appraiser, James Brabant, to address the Ordinance's comparable rents factor. Brabant believed the Park's spaces had an overall rental value of $400, for an increase of $40. In Dr. Baar's report, however, he criticized Brabant's inclusion in his analysis of some spaces not subject to rent control. For instance, when a mobilehome is sold in place, the owner may raise rent for its space without applying to the Board. Dr. Baar found that when such rents were excluded from the study, Berger's rents lagged those of comparable spaces by $25.

The tenants objected to any rent increase, but their representative argued that if the Board granted an increase it should not exceed $25. Several tenants submitted letters of hardship.

The Board rejected Dr. Baar's recommendation of a minimum rent increase of $38.44. It also rejected Brabant's comparable rents analysis of $40. It granted a $31 rent increase by averaging three figures: an increase of $25 based on Dr. Baar's analysis of controlled rents; an increase of $31.67 based on an increase of existing rents by 60 percent of the increase in the CPI; and $38.44 based on an MNOI standard that indexes base year NOI at 40 percent of the increase in the CPI. The Board added these figures, divided the total by three and rounded the result of $31.70 down to the nearest dollar.

2

We conclude the Board's ruling lacks evidentiary support. Although the Board was not required to employ any specific formula, its averaging method was faulty because there was no showing that two of the figures the Board relied on were within the range of reasonable rents under the fair return criterion. Conceptually, several figures may be averaged to arrive at a new rent only if each of the figures is independently within the range of reasonableness.

Weighing the competing interests of owners and tenants and satisfying constitutional criteria is not a task within common experience. To the contrary, courts "consider it a matter of expert opinion what rate of return on a mobilehome park is fair." (*Whispering Pines Mobile Home Park, Ltd. v. City of Scotts Valley* (1986) 180 Cal.App.3d 152, 160 [225 Cal.Rptr. 364] (*Whispering Pines*); see *Concord Communities v. City of Concord* (2001) 91 Cal.App.4th 1407, 1416 [111 Cal.Rptr.2d 511] (*Concord Communities.*)

---

include costs properly associated with the operation of a mobilehome park (such as property taxes, fuel, and utilities)."

In *Whispering Pines*, the court held a rent commission erred by rejecting expert testimony on the fair rate of return issue and relying instead on " 'factors of common knowledge and experience,' " such as the state of the economy and high interest rates. (*Whispering Pines, supra,* 180 Cal.App.3d at p. 160.) The court concluded that "[s]ince there is no proper evidentiary basis for the Commission's conclusions on a fair rate of return, there is no basis for the trial court's conclusion the Commission's findings were supported by the evidence." (*Id.* at p. 161.) Similarly, in *Concord Communities* the court held the rent control board's finding that base rents were not significantly below market value lacked evidentiary support. The board rejected expert testimony and premised its finding on "personal experience and knowledge of real estate." (*Concord Communities, supra,* 91 Cal.App.4th at p. 1416; see also *Galland v. City of Clovis, supra,* 24 Cal.4th at p. 1021 [determining prices that will provide a fair return is product of expert judgment].)

Dr. Baar neither recommended a $25 rent increase based on the single factor of comparable rents, nor stated such an increase would satisfy the fair return standard. Rather, he believed a minimum increase of $38.44, under a modified MNOI standard, was required to meet the fair return standard. Dr. Baar's report explains that "[if] a fair return is provided [under an MNOI standard], *no additional increase* would be justified by the 'comparable' rent factor." (Italics added.) Further, Dr. Baar wrote that the "difference between the result required to permit a fair return ($38.44 . . . .) and the result that would be justified under [Brabant's] comparable [rents] approach ($40.00) is not substantial. In the past comparables have only been considered as a relevant factor if the differences in rents among comparable parks are significant." Dr. Baar indicated this is not such a case.

██  Additionally, the City's staff rejected the notion that a $25 rent increase would provide a fair rate of return. Rather, staff advised the Board that if it intended to rely on the comparable rents factor Brabant's "approach of $40 is more in keeping with the language of the Ordinance." The Ordinance directs the Board to consider, among numerous other factors, the "rent lawfully charged for comparable mobilehome spaces in the City of Escondido." The construction of an ordinance is a pure question of law for the court, and the rules applying to construction of statutes apply equally to ordinances. (*Aptos Seascape Corp. v. County of Santa Cruz* (1982) 138 Cal.App.3d 484, 497 [188 Cal.Rptr. 191]; *County of Madera v. Superior Court* (1974) 39 Cal.App.3d 665, 668 [114 Cal.Rptr. 283].) "Our primary aim in construing any law is to determine the legislative intent. [Citation.] In doing so we look first to the words of the statute, giving them their usual and ordinary meaning." (*Committee of Seven Thousand v. Superior Court* (1988) 45 Cal.3d 491, 501 [247 Cal.Rptr. 362, 754 P.2d 708].)

At the hearing, Dr. Baar conceded that "[l]iterally reading that term [the comparable rents factor], it would mean any rents that are charged as long as they are not in violation of the law." Brabant advised the Board his $40 comparable rents figure was based on "what I believe to be all of the lawfully charged rents at comparable parks." Given the plain language of the Ordinance, we cannot say the voters who approved the rent control scheme intended to exclude noncontrolled rents from a comparability study. For comparability, the mobilehome park *spaces* must be comparable, not the manner in which rents are set.

Likewise, no evidence was presented that a rent increase of $31.67, based on a straight CPI increase at the 60 percent level, would constitute a fair return, taking the effect of inflation into consideration. The mere fact that an expert's report includes consideration of various single factors enumerated in the Ordinance does not show a rent increase based thereon would provide a fair return.

The City points out that "due process only requires a fair return on the mobilehome park as a whole, not a fair return on each discrete aspect of the park," such as each capital improvement. (*Morgan v. City of Chino, supra,* 115 Cal.App.4th at p. 1199.) The City suggests a $31 increase would provide a fair return even if it does not cover all of its increased operating costs or specific capital improvements. To any extent that is arguably correct, it remains that there was no evidence before the Board to support the use of the $25 and $31.67 figures in deciding the fair return issue. Further, Dr. Baar found that in this instance a fair return would cover increased operating expenses and capital improvements.

Under these circumstances, we must reverse the superior court judgment insofar as it denies Berger's petition for writ of mandate. Berger is entitled to a new hearing for the Board's reconsideration of the matter.

## II

### *Indexing for Inflation to Protect NOI*

It is not our province to specify what standard the Board should use on remand. For its instruction, however, we address Berger's contention that as a matter of law in an MNOI analysis, to account for inflation the base year NOI must be indexed by no less than 100 percent of the increase in the CPI to avoid unconstitutional confiscation over time. We are unpersuaded by Berger's position.

██ Berger relies on *City of Berkeley, supra*, 27 Cal.App.4th 951, in which the issue was whether the rent stabilization board abused its discretion by adopting certain regulations, including a regulation allowing full indexing of rents for inflation to protect base year NOI, without excluding debt service. (*Id.* at p. 964.) The court found the regulation was within the board's discretion to set rents that provide a fair return on investment to the landlord. (*Id.* at p. 968.) The board there presumably relied on advice from its consultants "that fully indexing for inflation, including the debt service component, is necessary because the failure to do so will inevitably lead to the slow erosion of net operating income." (*Id.* at p. 975.)

*City of Berkeley*, however, does not indicate that indexing at the 100 percent level is a constitutional mandate; that question was not before the court. The court noted, "we are not called upon to actually decide whether the Board could have legally decided to *exclude* debt service; we need only observe that it acted legally when it decided to *include* it." (*City of Berkeley, supra*, 27 Cal.App.4th at p. 977.) " 'It is axiomatic that cases are not authority for propositions not considered.' " (*In re Marriage of Cornejo* (1996) 13 Cal.4th 381, 388 [53 Cal.Rptr.2d 81, 916 P.2d 476].)

In *Yee v. Mobilehome Park Rental Review Bd., supra*, 17 Cal.App.4th at page 1105, this court rejected the park owners' argument they were denied substantive due process because the Ordinance under review here does not *require* annual increases in rents equal to changes in the CPI. (See also *Carson Mobilehome Park Owners' Assn. v. City of Carson, supra*, 35 Cal.3d at p. 195 [CPI increase "might not be warranted for a particular mobilehome park if there has been a decrease in maintenance expenditures or a reduction in services provided to the tenant"].)

Here, the City's consultant, Dr. Baar, advised that 100 percent indexing is not required for the Park to achieve a fair return. A mobilehome park's operating expenses do not necessarily increase from year to year at the rate of inflation, and indeed, during the relevant time here the CPI increased 14.55 percent, but Berger's operating expenses increased only 9.4 percent. On appeal, Berger concedes that a "general increase at 100% of CPI . . . would be too much if expenses have increased at a lower rate." Moreover, as Dr. Baar explained in his report, the use of indexing ratios may satisfy the fair return criterion because park owners typically derive a return on their investment not only from income the park produces, but also from an increase in the property's value or equity over time. In other words, investors

are motivated to acquire, retain and maintain mobilehome parks both for the yearly income and for appreciation in real estate.[10]

The Board will reconsider the issue at the new hearing, in light of the fair return standard. It is not, however, required as a matter of law to use 100 percent indexing of NOI in an MNOI approach.

III

*Summary Judgment*

■ In its reply brief, Berger cursorily contends the court erred by granting summary judgment on its complaint for inverse condemnation and violation of due process (42 U.S.C § 1983). Berger, however, did not properly raise the issue in its opening brief. An appellant abandons an issue by failing to raise it in the opening brief. (*California Recreation Industries v. Kierstead* (1988) 199 Cal.App.3d 203, 205, fn. 1 [244 Cal.Rptr. 632].) Moreover, in its reply brief, Berger does not cite the appellate record, cite any legal authority or raise any particular argument regarding summary judgment. When a party provides a brief "without argument, citation of authority or record reference establishing that the points were made below," we may "treat the points as waived, or meritless, and pass them without further consideration." (*Troensegaard v. Silvercrest Industries, Inc.* (1985) 175 Cal.App.3d 218, 228 [220 Cal.Rptr. 712].)

■ In any event, the summary judgment was proper. "[A] price regulation that causes confiscation may be designated interchangeably as either a taking of property under the Fifth and Fourteenth Amendments of the United States Constitution or a violation of due process." (*Galland v. City of Clovis, supra,* 24 Cal.4th at p. 1024.) As the court explained in *Kavanau v. Santa Monica Rent Control Bd.* (1997) 16 Cal.4th 761, 786 [66 Cal.Rptr.2d 672,

---

[10] Dr. Baar's report states: "The 'leveraged' nature of real estate investments may allow investors to obtain a reasonable return on their investments when rates of indexing are well below 100% of CPI. As a result of the leveraging factor, the return on investment may be a multiple of the rate of increase in the net operating income and value of the property. [¶] . . . [¶] If an investor purchases a mobilehome park for $1,000,000 with a . . . $300,000 . . . downpayment [sic], a 20% increase in the NOI . . . leads to a 20% ($200,000) increase in the value of the park and, consequently, a $200,000 (67%) increase in the owner's equity."

Berger submits this rationale does not apply to it because it acquired the Park by donation and has no debt. For purposes of determining a fair return, however, a rent control board may impute an investment to a landlord who acquires a park by gift or inheritance, for instance by using the transferor's investment with any necessary adjustments. (*Fisher v. City of Berkeley, supra,* 37 Cal.3d at p. 685.) Berger has given no convincing rationale for treating leveraged owners differently from owners privileged to acquire property without incurring any debt.

941 P.2d 851], however, when the remedy of future rent adjustments is available as a matter of due process, as here, there can be no taking or other civil rights violation.

## DISPOSITION

We reverse the judgment insofar as the denial of the petition for writ of mandate is concerned, and instruct the superior court to issue a writ directing the Board to vacate its decision and conduct a new hearing consistent with this opinion. In all other respects the judgment is affirmed. The parties are to bear their own costs on appeal.

Benke, J., and Irion, J., concurred.